Filed 8/17/20  Yuba City Unified etc. v. Cal. State Teachers' Retirement etc. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| YUBA CITY UNIFIED SCHOOL DISTRICT, | C088280 |
| Plaintiff and Respondent, | (Super. Ct. No. PT15-1241) |
| v. | |
| CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, | |
| Defendant and Appellant. | |

The California State Teachers' Retirement System (CalSTRS) appeals from a judgment granting a petition for writ of mandate in favor of the Yuba City Unified School District (District) and directing CalSTRS to set aside its decision to recover retirement benefit overpayments from 46 retired teachers.  We reversed an earlier judgment in the District's favor in *Yuba City Unified School Dist. v. California State Teachers' Retirement System* (2017) 18 Cal.App.5th 648 (*Yuba City I*).  There, as here, the question presented was whether CalSTRS's attempt to recover the overpayments was barred by the applicable statute of limitations, Education Code section 22008, subdivision

1

(c).[1]  (*Yuba City I, supra,* at p. 651.)  We agreed with CalSTRS that an October 2005 letter from CalSTRS to one of the retirees failed to demonstrate actual notice of the relevant overpayments on the part of the retirement system.  (*Ibid.*)  However, we concluded that section 22008, subdivision (c)'s three year statute of limitations could be triggered by inquiry notice of an overpayment, and remanded for further proceedings on the question whether the letter and surrounding circumstances established such inquiry notice.  (*Yuba City I, supra,* at p. 659.)

The trial court, on remand, found the letter provided notice or information of circumstances that should have put CalSTRS on inquiry notice, or at least presented CalSTRS with the opportunity to obtain knowledge from sources open to its investigation.  Accordingly, the trial court determined that CalSTRS was on inquiry notice of the overpayments in October 2005, triggering the statute of limitations.  We conclude substantial evidence supports the trial court's determination.  Consequently, we will affirm the judgment.

## I.  BACKGROUND

CalSTRS is the state agency responsible for managing contributions made by employees and member school districts to the State Teachers' Retirement Fund (Fund).  (*Yuba City I, supra,* 18 Cal.App.5th at p. 651.)  The Fund is among the largest in the nation, with assets exceeding $148 billion around the time of some of the events giving rise to this action.  CalSTRS has a statutory duty to use "care, skill, prudence, and diligence" in the management of the Fund (§ 22250, subd. (b)), and a constitutional duty to " ' "ensure the rights of members and retirees to their full, *earned* benefits," ' " and avoid paying benefits to " ' "persons not entitled thereto." ' "  (*Duarte v. State Teachers' Retirement System* (2014) 232 Cal.App.4th 370, 385.)

---

[1] Undesignated statutory references are to the Education Code.

Along with its fiduciary duties, "CalSTRS is charged with determining 'the appropriate crediting of contributions between the Defined Benefit Program and the Defined Benefit Supplement Program.' " (*Yuba City I, supra,* 18 Cal.App.5th at p. 651.) "The Board may audit the records of a public agency (§ 22206) and require the county superintendent or any employing agency to provide pertinent information regarding members (§ 22455)." (*Ibid.*)

CalSTRS audited the District and found "the District had incorrectly reported certain one-time payments as creditable to the Defined Benefit Program instead of the Defined Benefit Supplement Program for members who retired between the 2002-2003 and 2008-2009 school years." (*Yuba City I, supra,* 18 Cal.App.5th at p. 652.) Specifically, the District was found to have misreported two types of payments: (1) payments of $1,750 upon retirement, and (2) payments of 25 percent of the member's last year's base salary. (*Ibid.*) These reporting errors caused final compensation to be overstated in some cases, resulting in overpayments ranging from $12 to $992 per month per retiree. (*Ibid.*)

CalSTRS issued a final audit report in December 2012. (*Yuba City I, supra,* 18 Cal.App.5th at p. 652.) The report found that accumulated overpayments to retirees amounted to more than $563,000. CalSTRS resolved to recover the overpayments by reducing monthly payments to affected retirees and deducting five percent from their reduced monthly benefits.

The District and 47 retired members appealed from the final audit report, and moved to dismiss pursuant to section 22008, subdivision (c).[2] (*Yuba City I, supra,* 18 Cal.App.5th at p. 652.) The motion to dismiss was based on an October 15, 2005 letter from CalSTRS to Lavaune Bell, who retired from the District at the end of the 2004-2005

---

[2] One of the retirees has since passed away. (*Yuba City I, supra,* 18 Cal.App.5th at p. 652, fn. 2.)

3

school year. (*Ibid.*) Bell received the $1,750 and 25 percent payments, both of which were incorrectly credited to her Defined Benefit Account, rather than her Defined Benefit Supplement Account.

After she retired, Bell withdrew money from her Defined Benefit Account. Shortly thereafter, she received a letter on CalSTRS's letterhead. The letter bore a signature line for "Service Retirement," but was unsigned. The letter read, in pertinent part: "Your monthly benefit has changed from estimates or payments you previously received. The change is either the result of additional employer reporting or an internal correction to your account." The letter explained that Bell's retirement benefits had been recalculated, resulting in an "overpayment." The letter stated that CalSTRS would deduct five percent from Bell's monthly benefits until the overpayment was "paid in full." Bell's new monthly retirement benefit calculation, which was set forth in the letter, excluded the 25 percent payment, but continued to reflect the $1,750 payment.

A hearing on the District's appeal and motion to dismiss was held before an administrative law judge (ALJ) in December 2014. (*Yuba City I, supra,* 18 Cal.App.5th at p. 652.) The ALJ received a declaration from a CalSTRS program manager describing the circumstances giving rise to the letter as follows: "Employers submit earnings and contribution data through an automated system to CalSTRS. The majority of employers report their data directly to the county office of education, which is then reported to the CalSTRS system via a direct reporting portal known as the Secure Employer Website ('SEW'). Information is then automatically processed by the CalSTRS system for calculating a benefit. As a result, CalSTRS does not know the nature of the service performed based upon this reporting; only the compensation paid, the compensation earnable (full-time equivalent), and the associated contributions. Unless there is a manual review, such as an audit, of the collective bargaining agreement or employment contract associated with the individual reporting lines, CalSTRS cannot verify the nature

4

of service performed. Review of collective bargaining agreements and employment contracts would be conducted by CalSTRS' Audit Services Division."

The program manager's declaration continues: "If an employer provides additional employer reporting or if there is an internal correction to a member's account, the system utilized by CalSTRS will create an automatic computer-generated letter. Additional employer reporting may consist of changes to the compensation, compensation earnable, or sick leave that is reported to CalSTRS. An internal correction usually pertains to correcting data residing in the pension administration system outside of normal employer reporting, either through a technical or manual fix. CalSTRS would make the correction which would result in the system automatically generating a letter sent to the member attempting to explain the change."

The program manager's declaration indicates the letter to Bell was one such automatically generated letter. The program manager's declaration also indicates the letter was not evidence that any audit or review of Bell's account had taken place, and indeed, no such audit or review took place prior to the one that resulted in the final audit report in December 2012. No evidence was presented that anyone from CalSTRS saw or reviewed the letter in October 2005.

After the hearing, the ALJ issued a proposed decision denying the appeal and motion to dismiss. (*Yuba City I, supra,* 18 Cal.App.5th at p. 652.) The ALJ concluded that section 22008, subdivision (c)'s three-year statute of limitations began to run when CalSTRS discovered the incorrect payments following the audit in 2012. As relevant here, the ALJ found "there was not adequate evidence to conclude that the October 15, 2005 letter to . . . Bell demonstrated that CalSTRS, in 2005, was made sufficiently aware of the District's coding of the 25% and $1,750 payments to the DB Program to put CalSTRS on notice that it needed to take prompt action relating to all the teacher respondents. On its face, the October 15, 2005 letter did not explicitly refer to either the 25% payment or the $1,750 payment. It is not clear from that letter who may have

5

inputted the information into the CalSTRS system that resulted in the recalculation of . . . Bell's monthly retirement benefit. Consequently, the evidence did not establish that when . . . Bell's monthly retirement benefit was recalculated in 2005, CalSTRS was aware of the general coding issues surrounding the 25% and $1,750 payments to trigger the running of the limitations period set forth in . . . section 22008."

CalSTRS adopted the ALJ's proposed decision on July 9, 2015. (*Yuba City I, supra,* 18 Cal.App.5th at p. 653.) The District filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5 seeking to set aside the decision. (*Yuba City I, supra,* at p. 653.) The trial court issued a statement of decision adopting the ALJ's findings of fact, but not her conclusions of law. (*Ibid.*) The trial court concluded: " 'Whether the 2005 letter constitutes actual or inquiry notice is a conclusion of law. [¶] The 2005 letter from [CalSTRS] to [Bell] constitutes actual notice to [CalSTRS] of the payment issues.' " (*Ibid.*) Having concluded that CalSTRS had actual notice of the overpayments in 2005, the trial court further concluded that CalSTRS's efforts to recover the overpayments were " 'untimely and must cease.' " (*Ibid.*) Accordingly, the trial court issued a peremptory writ of mandamus and entered judgment accordingly. (*Id.* at p. 654.)

CalSTRS appealed and we reversed. (*Yuba City I, supra,* 18 Cal.App.5th at p. 651.) We rejected the trial court's conclusion that determining whether the letter triggered the statute of limitations was a question of law. (*Id.* at pp. 655-656.) "Under the facts presented here," we concluded, "determining whether the letter triggered the statute of limitations is a question of fact." (*Id.* at p. 655) We also rejected CalSTRS's argument—renewed herein—that the statute of limitations analysis can be meaningfully compared to the interpretation of a written instrument, such that the de novo standard of review would apply in the absence of conflicting extrinsic evidence. (*Id.* at p. 655.) Turning to the evidence, we observed: "The letter refers only to one individual and unspecified 'additional employer reporting or an internal correction to [her] account.'

6

What that reporting or correction was, beyond what was reflected in the recalculation, is not explained. The letter does not demonstrate actual notice regarding errors in coding of the $1,750 payments to any of the retirees or that there was an error in coding of the 25 percent payment as to a different retiree. The letter simply does not inform CalSTRS of the errors at issue in this litigation. As such, the letter neither constitutes actual notice as a matter of law nor would it constitute sufficient evidence to support a factual finding of actual notice." (*Id.* at pp. 655-656.) We reasoned, however, that "[t]he letter is . . . relevant to the question of whether CalSTRS should have investigated the District's reporting practices generally." (*Id.* at p. 656.)

We then went on to consider whether inquiry notice is sufficient to trigger section 22008, subdivision (c)'s three-year statute of limitations. (*Yuba City I, supra,* 18 Cal.App.5th at p. 656.) We concluded that it is. (*Id.* at pp. 656-658.) Turning back to the evidence, we explained: "The superior court did not address the question of inquiry notice and we are not able to resolve the question because it is a question of fact. 'The date that a person in the exercise of reasonable diligence should have discovered the facts is a question of fact.' [Citation.] The superior court concluded incorrectly that evaluating whether the 2005 letter constituted actual or inquiry notice was a question of law. A letter describing one error is not sufficient *as a matter of law* to put the agency on notice of other errors. Whether the letter provided inquiry notice turns on the specific facts and context surrounding that letter." (*Id.* at p. 659.) We concluded: "Here the facts as a whole are susceptible to opposing inferences regarding whether they were sufficient to put a reasonable person on inquiry notice of the overall reporting problems. Accordingly, this case presents a question of fact." (*Ibid.*) We observed that the dispositive factual issue "was apparently never addressed by the administrative decision nor properly addressed by the superior court's ruling," and remanded for further proceedings on the question whether CalSTRS had inquiry notice of the overpayment issues. (*Ibid.*)

7

The parties returned to the trial court. Following further briefing and argument, the trial court issued a statement of decision finding, inter alia, that: "The letter to Ms. Bell establishes that [CalSTRS] knew of circumstances that should have made it 'suspicious' that an incorrect payment had been made, or, at least, that [CalSTRS] had 'the opportunity to obtain [such] knowledge from sources open to [its] investigation.' " The trial court went on: "Given the scope of [CalSTRS's] obligations to its members, . . . a 'reasonably diligent' investigation would have revealed that Ms. Bell's retirement incentive payments had been misreported—including the $1,750 and 25% payments—as creditable compensation to the DB Program." "Similarly," the trial court continued, "[CalSTRS] should also have suspected that this miscoding would be replicated for other retiring employees, who would be entitled to such payments under the same contractual provisions as Ms. Bell." The trial court rejected CalSTRS's argument that the letter was not capable of imparting inquiry notice because it was computer generated. Accordingly, the trial court granted the District's petition for a writ of mandate and set aside CalSTRS's decision to recover the overpayments to the retirees. This appeal timely followed.

## II. DISCUSSION

We discussed the applicable standard of review in *Yuba City I, supra.* We explained: "Because CalSTRS's administrative decision to seek repayment substantially affects the retirees' fundamental vested right in the State Teachers' Retirement Fund to the amount to which they are entitled by law, the independent judgment standard of review applies. [Citations.] Under this standard, 'a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' [Citation.] '[T]he standard of review on appeal of the trial court's determination is the substantial evidence test.' [Citation.] Additionally, 'we are not bound by any legal interpretations made by

8

the administrative agency or the trial court; rather, we make an independent review of any questions of law.' " (*Yuba City I, supra,* 18 Cal.App.5th at p. 654.) These standards govern our current inquiry as well.

A.	*Determining Whether the Letter Establishes Inquiry Notice is a Question of Fact*

CalSTRS argues that determining whether the letter provided inquiry notice of the overpayments is a question of law subject to de novo review. We disagree.

" 'Resolution of the statute of limitations issue is normally a question of fact,' " reviewed for substantial evidence. (*Yuba City I, supra,* 18 Cal.App.5th at p. 655, quoting *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810).) There are circumstances in which the statute of limitations issue may be decided as a matter of law, subject to de novo review (see, e.g., *International Engine Parts v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611-612 [when "the relevant facts are not in dispute, the application of the statute of limitations may be decided as a question of law"]; see also *Snow v. A.H. Robins Co.* (1985) 165 Cal.App.3d 120, 128 ["whenever reasonable minds can draw only one conclusion from the evidence, the question becomes one of law"]), but these circumstances are not present here.

CalSTRS argues that determining whether the letter triggered the statute of limitations involves the application of law to undisputed facts, which we should review de novo. It is true, as CalSTRS observes, that the contents of the letter and circumstances surrounding its creation are largely undisputed. But the inferences to be drawn from those facts are not. As we observed in *Yuba City I,* "the facts as a whole are susceptible to opposing inferences regarding whether they were sufficient to put a reasonable person on inquiry notice of the overall reporting problems." (*Yuba City I, supra,* 18 Cal.App.5th at p. 659.) Where, as here, the facts are susceptible to opposing inferences, the notice question becomes an issue of fact, which is resolved by the trier of fact and reviewed for substantial evidence. (See *Saliter v. Pierce Brothers Mortuaries* (1978) 81 Cal.App.3d 292, 300 [notice may be decided as a matter of law where the facts "support only one

9

legitimate inference"; notice is a question of fact where the facts are susceptible to opposing inferences].) Such is the case here. (*Yuba City I, supra,* at p. 659.)

CalSTRS also argues by analogy to contract law that our statute of limitations analysis turns on the interpretation of a writing (the letter), which is subject to de novo review. CalSTRS advanced a nearly identical argument in *Yuba City I,* which we unambiguously rejected. (*Yuba City I, supra,* 18 Cal.App.5th at p. 655.) We explained: "Contrary to what is suggested by this argument, the letter is not a contract to be interpreted pursuant to the canons of contract interpretation. The letter is an item of evidence introduced to demonstrate what CalSTRS knew. In other words, the question before us is not the interpretation of the text of the letter but whether the existence of the letter demonstrates knowledge on the part of CalSTRS." (*Ibid.*) CalSTRS makes no effort to distinguish our prior analysis in the context of the present appeal or demonstrate that our view of the letter-as-written-instrument argument was wrong. Accordingly, we reject the argument for the reasons previously stated in *Yuba City I*, and review the trial court's finding of inquiry notice for substantial evidence. (*Ibid.*)

B.     *Substantial Evidence Supports the Finding that CalSTRS was on Inquiry Notice*

Section 22008, subdivision (c)'s three-year limitations period begins to run when a claimant has actual or inquiry notice of an incorrect payment. (*Yuba City I, supra,* 18 Cal.App.5th at p. 657; see also *Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 360.) We have already concluded the letter does not establish actual notice of the overpayments. (*Yuba City I, supra,* at pp. 656-657.) We now consider whether substantial evidence supports the trial court's finding that the letter put CalSTRS on inquiry notice of the overpayments.

A party has inquiry notice when they become aware of information or circumstances that would make a reasonably prudent person suspicious, or when they have the opportunity to obtain knowledge from sources open to her investigation. (*Fox v. Ethicon Endo-Surgery, Inc., supra,* 35 Cal.4th at p. 808.) "In other words, plaintiffs are

10

required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Ibid.*) "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111.)

Substantial evidence supports the trial court's finding that the letter establishes inquiry notice in the circumstances of this case. Although the letter does not specifically refer to the 25 percent or $1,750 payments, its stated purpose was to announce a change in the way Bell's monthly retirement benefits were calculated, suggesting an error in the original calculations. The benefits recalculation in the letter reverses the 25 percent payment incorrectly credited to Bell's Defined Benefit Account, and reveals overpayments of more than $4,600 in the span of only four months. As the District observes, the error, left uncorrected, would have resulted in overpayments of more than $13,000 a year for each of Bell's remaining years. The trial court could reasonably conclude that the contents of the letter should have given CalSTRS, an agency vested with broad fiduciary duties and statutory auditing powers (§§ 22206; 22250, subd. (b)), reason to suspect a potential problem with the District's reporting of the 25 percent payment. (*Fox v. Ethicon Endo-Surgery, Inc., supra,* 35 Cal.4th at p. 808.) The trial court could further conclude that a reasonably diligent investigation by an agency charged with exercising "care, skill, prudence, and diligence" in the management of the Fund (§ 22250, subd. (b)) and avoiding payments of unearned benefits (*Duarte v. State Teachers' Retirement System, supra,* 232 Cal.App.4th at p. 385) would have uncovered the erroneously reported $1,750 payment to Bell, raising a red flag that other retirees might have received similar overpayments, for similar reasons. Under the circumstances,

11

and considering CalSTRS's statutory powers and obligations, we are satisfied that substantial evidence supports the trial court's finding that CalSTRS had, through the letter, " ' " 'notice or information of circumstances to put a reasonable person *on inquiry*' " ' " (*Jolly v. Eli Lilly & Co, supra,* 44 Cal.3d at pp. 1110-1111) that reporting errors had been made, resulting in overpayments to retirees, and triggering the three-year statute of limitations.

CalSTRS resists this conclusion, arguing the agency cannot be expected to manually review members' accounts for small overpayments of the type Bell received and ultimately repaid. CalSTRS emphasizes the volume of data it receives from school districts every day, opining that, "[i]t would be imprudent and a breach of its fiduciary duty for CalSTRS to use its limited resources to investigate a District's 'general reporting practices' each time there is a small change in a member's pension benefits, particularly a change the member does not contest." The District responds that CalSTRS's fiduciary duties require some sort of review where, as here, the reporting error may have been replicated across the accounts of multiple members. We need not pass on the merits of this debate, as we are concerned, not with the limits of CalSTRS's fiduciary duties, but with the sufficiency of the evidence supporting the trial court's finding that CalSTRS had " ' " 'notice or information of circumstances to put a reasonable person *on inquiry*.' " ' " (*Jolly v. Eli Lilly & Co, supra,* 44 Cal.3d at pp. 1110-1111.) That CalSTRS may reasonably choose to forego an investigation into the District's "general reporting practices" for every small change in a member's benefits does not preclude a finding that the letter should have made CalSTRS suspicious that an overpayment had been made, or at least, that CalSTRS had the opportunity to obtain knowledge of the overpayments from sources open to its investigation. On the record before us, the trial court could have found that CalSTRS would have been likely to have discovered the overpayments by simply pulling on the threads contained in the letter, such that a districtwide audit was not required to trigger the running of the statute of limitations. As we have suggested,

12

substantial evidence supports such a finding.  CalSTRS's challenge to the judgment granting the petition for writ of mandate cannot succeed.

### III.  DISPOSITION

We affirm the judgment.  The District shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

_____

RENNER, J.


We concur:

/S/

_____

ROBIE, Acting P. J.


/S/

_____

KRAUSE, J.